# In the United States Court of Federal Claims

Nos. 24-162 & 24-201
Filed: April 30, 2024
Re-issued: May 16, 2024[1]

_____

)
KEARNEY & COMPANY, P.C., *et al.*,    )
                                       )
         *Plaintiffs*,    )
                                       )
  v.                                   )
                                       )
THE UNITED STATES,                     )
                                       )
         *Defendant*.    )
_____    )

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., with whom were *Kara L. Daniels* and *Sarah A. Belmont*, for Plaintiff Kearney & Company, P.C.

*Anne Bluth Perry*, Sheppard Mullin Richter & Hampton LLP, Washington, D.C., with whom were *Jonathan S. Aronie*, *Daniel J. Alvarado*, and *Lillia J. Damalouji*, for Plaintiff Deloitte & Touche LLP.

*Vincent D. Phillips, Jr.*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corrinne A. Niosi*, Assistant Director, for the United States.

## OPINION AND ORDER

**MEYERS, Judge**.

      The National Geospatial-Intelligence Agency (the "Agency") awarded Kearney & Company, P.C. a contract to provide support to the Agency's senior leadership, including support involving auditing financial statements. Unhappy with the Agency's award to Kearney, Deloitte & Touche LLP protested at the General Accounting Office ("GAO"). During a "predictive outcome" call, the GAO attorney assigned to Deloitte's protest indicated her belief that the GAO would sustain one, but only one, of Deloitte's protest arguments—that the solicitation at issue required an "exact match" between the work the Agency sought and the labor

---

[1] The Court initially filed this Opinion and Order under seal to allow the parties to propose redactions. The parties submitted their proposed redactions, ECF No. 34-1, and the Court has incorporated those proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

categories in the offerors' GSA schedule contracts.  Despite clearly disagreeing with this conclusion, the Agency quickly capitulated and chose to take corrective action based on the predictive outcome call.

Kearney then protested in this Court the Agency's decision to take corrective action based on the GAO attorney's predictive outcome.  Kearney finds many faults in the decision to take corrective action based on the GAO's decision, which Kearney contends flouts multiple rules and precedents.  Deloitte is also unsatisfied with the Agency's corrective action because Deloitte does not think that it goes far enough.  Deloitte contends that Kearney cannot compete for the disputed contract at all because Kearney's schedule contract does not contain any labor category that reasonably covers the work sought here, meaning that Kearney must be disqualified.

Because the Court agrees with Kearney that the proposed corrective action lacks a rational basis and that Kearney's contract reasonably encompasses the work the Agency seeks, the Court grants Kearney judgment on the administrative record and grants its requested injunctive relief.

**I.        Background**

Because these protests deal with the requirements for and evaluation of one position—the "Statistician-Senior"—the Court provides only a cursory overview of the procurement and focuses on the specific position at issue.

### A.        The Procurement

On December 1, 2022, the Agency solicited the Audit Remediation and Sustainment Operations ("ARSO") procurement "as a full and open competition" using the General Services Administration ("GSA") Multiple Award Schedule contract via a posted RFQ on GSA eBuy.  ECF No. 19-1 at AR 126.[2]  The RFQ sought a "contractor [to] collaborate with senior leadership, oversight, and functional stakeholders across NGA to identify, implement, and maintain policy, business process, and internal controls that provide significant business value to NGA; remediate audit findings and their root causes; and enhance the overall quality of business processes that underpin and enable the NGA mission."  *Id.* at AR 154.  Vendors were instructed to provide "convincing rationale supported by factual, verifiable information that fully demonstrates that the Offeror understands the requirements of this acquisition and all of the Government stated needs associated with the solicitation and resultant contract."  *Id.* at AR 252.

Offers were to be submitted in six volumes:

| Volume I | Cover Letter |
|---|---|
| Volume II | Factor I – Technical/Management |
| Volume III | Factor II – Past Performance |

---

[2] Due to a processing glitch, the administrative record in this case begins at ECF No. 19-1, continues in ECF No. 25-1, and concludes in ECF No. 19-2.  For ease of reference, the Court cites to the record by the applicable ECF No. and AR page(s).

| **Volume IV** | Factor III – Small Business Participation Plan |
| **Volume V** | Factor IV – Security |
| **Volume VI** | Factor V – Price[3] |

*Id.* at AR 325-30.

Factor I (technical/management) was broken into two sub-factors: technical understanding and key personnel. *Id.* at AR 147. Within the first sub-factor, the RFQ asked offerors to demonstrate its ability to handle five technical requirements: agency-level financial reporting, internal controls, audit liaison, audit remediation, and capital asset monitoring and valuation. *Id.* at AR 258. As for the second sub-factor, the RFQ lists three Key Personnel: program manager, financial manager-senior, and statistician-senior. *Id.* at AR 273-74. The RFQ listed the requirements for each key personnel, and in response to offeror's questions, the Agency clarified that the *personnel* "must meet the requirements of the ARSO PWS. No modifications/substitutions are permissible." *Id.* at AR 300. The Agency did expressly allow for mapping between proposed LCATs and the PWS requirements. *Id.* at AR 3445; ECF No. 19-2 at AR 131 ("Offerors can add an additional tab to map their GSA labor category to the RFQ labor category of Tab 1.").

Factors I and II (technical/management and past performance) were evaluated on a confidence rating scale. ECF No. 19-1 at AR 259. Factors II and IV (small business participation plan and security) were evaluated on a pass/fail basis. *Id.* at AR 149. Factor V (price) was evaluated for fairness and reasonableness. *Id.* at AR 262.

The confidence rating scale for factor I (technical/management) was broken down into three confidence ratings, shown below:[4]

| **Technical Evaluation Confidence Rating Scale** | |
|---|---|
| **Confidence Rating** | **Definition** |
| *High Confidence* | Based on the Vendor's technical response, the Government has a high expectation that the Vendor will successfully perform the required effort. |
| *Moderate Confidence* | Based on the Vendor's technical response, the Government has an expectation that the Vendor will successfully perform the required effort. |

---

[3] Volume VI also included a "MS Excel Price Quote Workbook" and advised offerors to "provide additional discounts on the Offeror's GSA contract prices." ECF No. 19-1 at AR 257.

[4] The RFQ provided a similar rating system for the past performance factor but added a "neutral confidence" rating that was defined as: "No recent/relevant performance record is available or the Vendor's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." ECF No. 19-2 at AR 3706.

3

| | |
|---|---|
| *Low Confidence* | Based on the Vendor's technical response, the Government has a low expectation that the Vendor will successfully perform the required effort. |

ECF No. 19-2 at AR 3705.

The RFQ notified offerors that the Agency would award a single "Firm-Fixed Price contract" to the "responsible vendor whose quotation, conforming to the RFQ, is most advantageous to the Government."  ECF No. 19-1 at AR 330.  The RFQ directed the Agency to determine the most advantageous vendor by trading off the equally weighted technical/management, past performance, and price factors.  *Id.* at AR 330.

### B.     The Competition

Four offerors submitted timely quotes, including Kearney and Deloitte.  *Id.* at AR 348, AR 483, AR 716 & AR 845.  As for the specific role in question, each offeror mapped to an LCAT on their GSA schedule to fill the role of senior statistician.

Kearney mapped the RFQ position to its Senior Management Analyst LCAT, which requires a bachelor's degree and at least two years of experience.  *Id.* at AR 3466.86.  The functional responsibilities are described as:

> Provides specific knowledge and methodologies for process improvements or reengineering of systems.  The Senior Management Analyst assists or may lead in the actual performance of systems reviews by identifying appropriate substantive testing, potential risks, and test of controls.

Deloitte mapped to its Risk Senior Project Support III position, which requires at least 4 years of experience and a BS/BA degree.  *Id.* at AR 3342.  The functional responsibilities include:

> The Risk Senior Project Support serves as SME over assigned support areas, instructing, directing, and monitoring the work of other project staff in the following business process, financial and technology risk service areas.  The Risk Senior Project Support provides senior management with work plans, status report and quality control analyses as well as suggestions for the engagements.

Guidehouse mapped to its [ * * * ].[5]  The position:

> [ * * * ].

---

[5] GUIDEHOUSE INC., FEDERAL SUPPLY SERVICE, AUTHORIZED FEDERAL SUPPLY SCHEDULE PRICE LIST: MULTIPLE AWARD SCHEDULE, (Mar. 11, 2022), https://www.gsaadvantage.gov/ref_text/GS00F045DA/0XH01F.3T7CY0_GS-00F-045DA_GS00F045DAMASPSSPRICELISTPS0033.PDF (last visited Apr. 30, 2024).

Ernst & Young used its [ * * * ].[6]  The position is described as:

[ * * * ].

The findings of the Source Selection Evaluation Board ("SSEB") resulted in the following ratings for Kearney and Deloitte:

| **EVALUATION SUMMARY** | **DELOITTE** | **KEARNEY** |
|---|---|---|
| **Factor I – Technical/Management** | High Confidence | High Confidence |
| *Sub-Factor 1.1 – Technical Understanding* | High Confidence | High Confidence |
| *Sub-Factor 1.2 – Key Personnel* | High Confidence | Moderate Confidence |
| **Factor II – Past Performance** | High Confidence | Moderate Confidence |
| **Factor III – Small Business Participation Plan** | Pass | Pass |
| **Factor IV – Security** | Pass | Pass |
| *Sub-Factor 4.1 – FCL/FOCI* | Pass | Pass |
| *Sub-Factor 4.2 – PCL/SCI Access* | Pass | Pass |
| *Sub-Factor 4.3 – Supply Chain Risk* | Pass | Pass |
| **Factor V – Total Evaluated Price** | [ * * * ] | $71,110,211.88 |

ECF No. 19-1 at AR 2129-30.

In the end, the Selection Decision Authority concluded that "Kearney provides the best overall value to the Government."  *Id.* at AR 2159.  On September 30, 2023, the Agency awarded the ARSO task order to Kearney.  ECF No. 19-2 at AR 4595.

### C. GAO Protest

On October 10, 2023, Deloitte filed a protest with the GAO protesting the Agency's award to Kearney.[7]  ECF No. 19-1 at AR 2365, 2369.  Deloitte primarily argued that the Agency

---

[6] ERNST & YOUNG LLP, FEDERAL SUPPLY SERVICE, AUTHORIZED FEDERAL SUPPLY SCHEDULE PRICE LIST: MULTIPLE AWARD SCHEDULE, (Mar. 10, 2022), https://www.gsaadvantage.gov/ref_text/GS00F290CA/0X0047.3SQD2W_GS-00F-290CA_ERNSTANDYOUNGLLPGS00F290CA.PDF (last visited Apr. 30, 2024).

[7] Deloitte filed a supplemental protest on October 26, 2023.  ECF No. 19-1 at AR 2394.

"improperly evaluated quotes under Factor 1 – technical/management," and the Agency "failed to conduct a proper best value tradeoff analysis." *Id.* at AR 2402, 2415.

Shortly before the opinion was due, the GAO held a predictive-outcome conference with the parties. GAO, however, prohibited transcription or recording, and the parties advance contradictory understandings of the call. The Government and Kearney understood that the GAO would likely sustain Deloitte's protest on a narrow issue—that, in GAO's opinion, the RFQ required an exact match between the RFQ's Statistician-Senior position and any of the offerors' FSS LCAT descriptions. ECF No. 27-1 at 2; ECF No. 28 at 8. Deloitte, on the other hand, heard things differently. Deloitte insists that the GAO held that "Kearney's proposed LCAT mapping was unreasonable because the services Kearney quoted exceeded the scope of . . . its FSS contract." ECF No. 29 at 7-8. And, Deloitte argues that "GAO never suggested, nor has Deloitte ever argued, that the PWS required an exact match between the vendors' quoted LCATs and the PWS Senior Statistician requirements." *Id.* The parties do agree on one thing: under the exact-match test: both Kearney and Deloitte—along with all offerors—would most likely be ineligible for the award.

Following the predictive-outcome conference, the Agency "elected to take corrective action" based on the points raised in the protest and conference. ECF No. 19-1 at AR 3433. In that corrective action, the Agency proposed to:

> 1. Terminate for convenience the award to Kearney.
>
> 2. Amend the Solicitation to clarify any apparent requirement that states or suggests the Agency cannot or will not permit vendors to map PWS-required labor categories onto available FSS labor categories that reasonably encompass the PWS requirements.
>
> 3. Conduct new price evaluations that assess whether the mapping of labor categories in the vendors' price volumes is reasonable. Consistent with GAO case law and its arguments presented before GAO in this protest, the Agency will continue to consider reasonable a vendor proposing an FSS labor category having lesser education and experience requirements than the PWS labor category, so long as the vendor made a commitment in its quote to provide personnel meeting the PWS minimums.
>
> 4. Prepare a new SSEB Chair Report incorporating the findings of the new price evaluations.
>
> 5. Prepare a new Selection Decision Document (SDD) incorporating the findings of the new price evaluations and the new SSEB Chair Report.
>
> 6. Issue a new award according to the SDD.

*Id.* at AR 3433. Deloitte objected to the proposed corrective action. *Id.* at AR 3435. Kearney did not object but noted that the corrective action rendered Deloitte's protest moot. *Id.* at AR 3442. The Agency joined Kearney in asking the GAO to declare Deloitte's protest moot. *Id.* at

AR 3443. On January 16, 2024, the GAO issued a decision dismissing Deloitte's protest as "academic" and moot. *Id.* at AR 3447-48.

On January 22, 2024, Deloitte filed another protest with the GAO because it believed that the Agency's corrective action could not cure the alleged defects with the RFQ. *Id.* at AR 3451-52. The Agency moved for express consideration of the new protest because it "fail[ed] to raise new grounds or additional arguments[.]" *Id.* at AR 3467. On January 31, 2024, Kearney filed a protest with this Court, *see* ECF No. 1, prompting the GAO to dismiss the pending Deloitte protest. *Id.* at AR 3471.

## II.     Legal Standard

This Court has jurisdiction over bid protests pursuant to the Tucker Act, which requires the Court to review the Government's action under the standards of the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(1) & (4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under the APA, the Court determines whether the Government's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Banknote*, 365 F.3d at 1350 (citation omitted). In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id*. at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). "When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id*. (quoting *Latecoere*, 19 F.3d at 1356), "and the 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis[.]'" *Id*. (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Id*. (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If an error is found in the procurement, the APA further instructs that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). The bid protester was prejudiced if "there was a substantial chance it would have received the contract award but for the" challenged action. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).

The inquiry is unchanged in the corrective action context. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018). This means that a corrective action will not be set aside if there is a rational basis for it, supported by a "coherent and reasonable explanation." *Id.* The agency need not admit an error before taking corrective action, *ManTech Telecomms. &*

*Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 65 (2001), and the corrective action need only be "reasonable under the circumstances." *Sierra Nev. Corp. v. United States*, 107 Fed. Cl. 735, 750 (2012).

**III.    Discussion**

    **A.    The RFQ does not require an exact match between the Statistician-Senior and an offeror's LCATs.**

    "The principles governing contract interpretation apply with equal force where the Court is tasked with interpreting a solicitation." *Eagle Techs., Inc. v. United States*, 163 Fed. Cl. 692, 704 (2022), *appeal dismissed*, No. 2023-1473, 2023 WL 2820095 (Fed. Cir. Apr. 7, 2023). That means the interpretation of a solicitation is a question of law. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Court does not give deference to the GAO on questions of law. *VS2, LLC v. United States*, 155 Fed. Cl. 738, 766 (2021).

    Because this is a matter of interpretation, the Court begins with the text of the RFQ to determine what level of specificity it requires between the PWS work and the supply contract LCATs. *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) ("We begin with the plain language."). And, if the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Id.* (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).

    The RFQ identifies the "Key Personnel" as the Program Manager, the Financial Manager-Senior, and the Statistician-Senior. ECF No. 25-1 at AR 2590-91. The RFQ also sets forth the following education and experience requirements for the Statistician-Senior:

| Education and Certification | Mandatory Experience | Desired Experience |
|---|---|---|
| Advanced degree in statistics, biostatistics, mathematics, a quantitative social science, or a similar field<br><br>(reference OMB Circular A-123, Appendix C) | Experience designing statistical samples and using statistical methods to calculate population estimates and sampling errors from a probability sample<br><br>(reference OMB Circular A-123, Appendix C) | CPA, CIA, CFE, CGFM, or CDFM Certification |

ECF No. 25-1 at AR 2590-91. These requirements clearly state that the person that fills the Statistician-Senior must have these characteristics. There is no dispute that the people that Kearney and Deloitte proposed do, in fact, meet these requirements.

    Because the RFQ cites to OMB Circular A-123 ("the Circular"), the Court also considers it to discern the RFQ's meaning. The Government included two copies of the Circular: a 2018 version and a 2021 version. The Court focuses on the 2021 Circular because it was in effect at the time of the procurement, and it replaced the guidance in the 2018 version. ECF No. 28-2 at

8

1.  While the 2018 Circular contained education requirements discussed below, the 2021 Circular removed all references to specific training recommendations, requiring only that the agencies "must work with their statistician to determine the appropriate confidence interval given program characteristics, available resources, and whether the estimate is reliable." ECF No. 28-2 at 18. Regardless, the 2018 version does not change the analysis.  Under the 2018 version of the Circular, the agencies were advised to employ a statistician who "*should*[8] have training and experience designing statistical samples and using statistical methods to calculate population estimates and sampling errors from a probability sample.  This person would *generally* have an advanced degree in statistics, biostatistics, mathematics, a quantitative social science, or a similar field."  ECF No. 28-1 at 15 (emphasis added).  Given that the RFQ makes the specialized degree a requirement of the RFQ, the Circular does not add anything significant to the equation.

In the end, the RFQ required the Statistician-Senior to have certain experience and qualifications.  But that does not end the inquiry because the dispute here centers on whether the RFQ required the LCAT to which the offerors mapped their Statistician-Senior to explicitly include these qualifications and experience.

Because everyone understands that an offeror's FSS contract will not have labor categories for every conceivable job title, the default rule is that parties may map[9] the PWS work to the LCATs on their FSS contracts.  Given this reality, differences in job titles and descriptions between the PWS and the LCATs are not dispositive.  *Eagle Techs., Inc.*, 163 Fed. Cl. at 703; *HomeSource Real Est. Asset Servs., Inc. v. United States*, 94 Fed. Cl. 466, 486 (2010), *aff'd*, 418 F. App'x 922 (Fed. Cir. 2011).  There is also no "prohibition on the government's common sense identification of overlapping, related labor categories." *Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 227 (2008).  And offering an LCAT that requires less experience is not *per se* prohibited, so long as the offeror commits to fulfilling the mandatory requirements of the PWS.  *Ishpi Info. Techs., Inc.*, B-420718.2, 2022 WL 3227036 (Comp. Gen. July 29, 2022) ("Where a solicitation requires vendors to perform using personnel that meet certain minimum qualification requirements, and requires vendors to map their labor categories to those minimum requirements, the record must include some sort of affirmative showing that the vendor intends to meet the RFQ's minimum requirements."); *Logmet LLC*, B-422200, 2024 WL 894253 (Comp. Gen. Feb. 21, 2024) ("Because the FSS labor category experience requirement is a minimum, it is necessarily within the scope of a corresponding solicitation labor category with a higher minimum experience requirement.").  Here, Kearney did so in its FSS contract, which provides: "Consistent with practices customary in the field of consulting related to professional services-type work, Kearney evaluates all personnel on a case-by-case basis to ensure that each employee meets or exceeds the minimum requirements of the specific labor categories."  ECF No. 19-1 at AR 3466.92.  Deloitte does the same.  *Id.* at AR 3348.

This approach was apparently so commonly understood that there was only one question during the procurement's Q&A that addressed it.  With regard to the Pricing Template, one

---

[8] The Circular defined "should" as "a presumptively mandatory requirement except in circumstances where the requirement is not relevant for the Agency."  ECF No. 28-1 at 6.

[9] In this context, "mapping" simply means identifying which LCAT on an offeror's FSS contract will be utilized to fill each role.

offeror asked: "Will the Government please confirm offeror's can add columns to show their GSA Labor category mapped to the RFQ Labor category Title on Tab 1."  ECF No. 19-2 at AR 3742 (Question 85).  The answer stated simply: "Offeror's can add an additional tab to map their GSA Labor category to the RFQ Labor category of Tab 1."  *Id*.  There is no indication that the Agency intended for any heightened correlation between the LCATs and the PWS work for the Key Personnel, and there is nothing in the answer to Question 85 that supports such a conclusion.

To the extent that any party had understood the RFQ to require a heightened correlation, or an exact match, between the PWS work and the offeror's LCATs based on the RFQ's requirements regarding Key Personnel, that would have been a patent ambiguity given Answer 85 did not limit the ability to map as normal.  Such arguments are waived.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  But that, of course, is a hypothetical that is belied by the record in this case given that no offeror read the solicitation that way when they submitted their proposals.

### B. The GAO attorney required an exact match between the PWS's Senior Statistician and offerors' LCATs.

The GAO read the RFQ quite differently.  The GAO attorney believed that the RFQ required an exact match between the PWS requirements and the LCATs parties mapped to.  Before turning to the merits of the GAO attorney's interpretation, the Court first notes that the GAO predictive outcome "alternative dispute resolution" telephone call left many more questions than resolutions in this matter.  Much of these questions flow from the fact that the GAO attorney did not allow the parties to record or transcribe the call.  Predictably, the parties walked away from the call with differing (and irreconcilable) interpretations of what was said.

According to Deloitte, it never argued for an exact match standard before the GAO and the GAO attorney did not say that there had to be an exact match between the PWS requirements and the LCATs.  Deloitte, in fact, flatly rejects the contention that the GAO attorney required an exact match, calling the assertion that she did "incorrect."  ECF No. 29 at 3.  In Deloitte's telling, the GAO attorney "never suggested . . . that the PWS required an exact match between the vendors' quoted LCATs and the PWS Senior Statistician requirements.  *Id.* at 4.  Rather, Deloitte understood the GAO attorney to conclude only that Kearney's proposed LCAT for the Senior Statistician was not "sufficiently close" to the work sought by the PWS.  *Id*.  The other two parties on the call, however, heard something very different—that there needed to be, in effect, an exact match[10] between the RFQ requirements and the offerors' FSS contract LCATs.  But Deloitte's arguments before the GAO tell a slightly different story.  Deloitte faulted Kearney's proposed LCAT for not including the terms "statistics" or "statistical subject matter expertise."  ECF No. 19-1 at 2768.  Deloitte's renewed protest (following the proposed corrective action) insisted that the solicitation was clear—"[t]he Agency was seeking a Senior Statistician with actual statistical skills and experience."  *Id.* at AR 3456.  Deloitte also argued that the PWS "**required** that the Senior Statistician . . . possess an 'advanced degree in statistics, biostatistics, mathematics, a quantitative social science, or similar field.'"  *Id.* at AR 3463.  In the end, the GAO attorney did not establish an exact-match requirement out of thin air.  But the fact that

---

[10] In its GAO briefing, Kearney referred to a "more exacting matching."  ECF No. 19-1 at AR 3441.

10

Deloitte's proposal reflects a clear understanding that such an exacting match to an LCAT was not required undermines its argument that the RFQ required such specificity. As GAO decisions (and basic fairness) have long held, "[t]he integrity of the protest process does not permit a protester to espouse one interpretation or position during the procurement, and then argue during a protest that the interpretation or position is unreasonable or otherwise improper." *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 400 (2021) (quoting *Facility Servs. Mgmt., Inc.*, B-418526, 2020 WL 3250212, at *5 (Comp. Gen. May 20, 2020)) (additional citations omitted).

The Court, of course, was not on the call with the GAO attorney and does not know what was said. There were three parties to the call with GAO—the Agency, Kearney's counsel, and Deloitte's counsel—and they clearly heard very different things. It is unclear why the GAO would not allow the parties to record the conference to prevent such a basic factual dispute. Indeed, GAO attorneys have sent written statements of their outcome predictions in other cases and there is no apparent reason why this one was different. *See, e.g.*, *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 713 (2011) (stating the GAO attorney provided the predictive outcome determination in an e-mail message).

That said, the record does provide sufficient evidence for the Court to conclude that the GAO attorney required an exact match between the offerors' LCATs and the PWS requirements for the Statistician-Senior. One of the few things that all parties to the predictive outcome call agree upon is that the GAO attorney said that Deloitte's proposal would also be ineligible for the same reason as Kearney's. ECF No 26-1 at 8 n.27 (Deloitte recognizing that the GAO attorney "noted that it appeared Deloitte also lacked a Senior Statistician labor category[.]"); ECF No 28 at 9-10 (Government recounting that the GAO attorney found that "LCAT mapping for *both* Kearney's and Deloitte's Senior Statistician position was similarly difficult to justify."); ECF No 27-1 at 25 (Kearney stating that based on the exact match requirement, GAO found that Kearney's and Deloitte's LCAT mappings appeared unreasonable). If there were no heightened standard that GAO applied (apparently based on Deloitte's arguments), there would have been no apparent reason for the conclusion that Deloitte's contract LCATs failed to meet the RFQ's requirements (as understood by the GAO attorney).

And there's a more important reason to accept that the GAO attorney applied an exact match requirement in her analysis—it is the *entire* basis of the corrective action. The Agency's Memorandum for Record, which was submitted to the GAO following the predictive outcome call, noted that the GAO attorney's interpretation of the RFQ was that "the RFQ required an exact match between the FCS LCAT description and the PWS's description for the Senior Statistician." ECF No. 19-2 at AR 4595; *id.* at AR 4603.[11] Of course, if the GAO attorney did not require the exact match, then Deloitte's argument proves too much. It would be wholly irrational to take corrective action based on a GAO predictive outcome premised on an "exact match" requirement if the GAO did not actually assert that requirement. Deloitte does not protest on this basis. And once the Agency informed GAO that it would take corrective action based on the GAO's exact match requirement, the GAO did not attempt to correct the record to

---

[11] Of course, if the Court were to credit Deloitte's argument that it did not argue for such a standard to apply, it would inexorably lead to the conclusion that the GAO's decision was arbitrary and capricious because it would be adopting an argument that nobody made to it.

11

state that it did not find an exact match requirement in the RFQ.  *See* ECF No. 19-1 at AR 3447-48.

### C. GAO's decision was irrational.

In general, when the Court considers the propriety of a procuring agency's decision to take corrective action based upon a GAO decision, this Court reviews whether the GAO's decision was itself rational.  *E.g.*, *Turner Constr. Co. v. United States,* 645 F.3d 1377, 1383 (Fed. Cir. 2011) (stating that "an agency's decision to follow a GAO recommendation . . . lacks a rational basis if it implements a GAO recommendation that is itself irrational"); *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed. Cir. 1989) ("[A] procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational."); *CBY Design Builders v. United States,* 105 Fed. Cl. 303, 339 (2012) ("When the relevant procurement official . . . decides to adopt the views of the GAO after a protest has been heard by that body, this agency decision is not considered inherently unreasonable (for departing from the agency's previous position) nor invulnerable (under the shield of GAO authority), but is instead measured by the rationality of the recommendation it follows.").  This applies to corrective action based on GAO's predicted outcome as well.  *Sys. Application*, 100 Fed. Cl. at 713.

The GAO's exact-match requirement was irrational because there "was no ambiguity in the solicitation" nor does the record show that any offeror was misled.  *Superior Optical Labs, Inc. v. United States*, 152 Fed. Cl. 319, 323, *aff'd*, 852 F. App'x 545 (Fed. Cir. 2021).  Instead, the opposite is true—each offeror and the Agency understood the RFQ to allow mapping the Statistician-Senior to LCATs that did not explicitly reference statistical experience or degrees.  *Every* offeror, including Deloitte, did so.  Not only does this show that Deloitte was not misled, it shows that Deloitte was not prejudiced by the Agency's not requiring mapping to LCATs that specifically referenced statistical education or experience.  Again, one of the only things that the parties agree upon from the predictive outcome conference is that the GAO attorney said that Deloitte's proposal failed the test Deloitte put forward.  It is the epitome of a lack of prejudice when adopting a protestor's argument would decrease the protestor's chance of award (or be excluded from consideration).  *Data Gen.*, 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").  Given that prejudicial error is a requirement for all protests, the Agency could not reasonably take corrective action on this basis.

The GAO attorney's interpretation of the RFQ to require an exact match between the LCATs and PWS positions is also contrary to clear GAO precedent.  While it is certainly true that an agency may require such an exact mapping, the default rule is that agencies have a "degree of agency discretion in determining whether a vendor's quoted labor categories meet the requirements of the solicitation."  *Guidehouse LLP*, B-419336, 2021 WL 674174 (Comp. Gen. Jan. 21, 2021); *see also Grant Thornton, LLC*, B-416733, 2018 WL 6303741 (Comp. Gen. Nov. 29, 2018) (sustaining a protest where the procuring agency required that the "vendor's quoted FSS categories 'align precisely' with the RFQ's labor categories").  It naturally follows that if the Agency intends to require such specificity, it must do so clearly.

Here too, the record makes clear that nobody other than the GAO attorney read the RFQ to require the heightened match to the education and experience requirements for the Statistician-Senior. In the same section of the RFQ that identifies the Statistician-Senior requirements, the RFQ also sets forth the educational and experience requirements for the other Key Personnel, namely the Program Manager and the Financial Manager-Senior. ECF No. 25-1 at AR 2590-91. The RFQ states that the Program Manager must have a bachelor's or master's degree in "accounting or [a] business management-related field" and one of six specific certifications. *Id*. There is not a single LCAT on any offeror's FSS contract that they mapped to that contains these requirements. Indeed, Deloitte mapped the Program Manager to its "Risk Management Principal/Partner" LCAT. ECF No. 19-1 at AR 1676. This LCAT makes no reference to anything regarding the subject matter of the degree nor any of the required certifications. ECF No. 19-1 at AR 3341-42. And the record is clear that no offeror contemporaneously understood the RFQ to require any such exact match because none mapped to LCATs that contain such references. There is nothing in the RFQ or in the record that justifies interpreting the Statistician-Senior requirements to call for an exact match to LCATs while the requirements for the other two Key Personnel do not.

Finally, because the GAO applied an exact match standard that is contrary to the default rule that mapping is permitted so long as the LCAT reasonably encompasses the PWS work, the Agency cannot rationally rely upon it in choosing to take corrective action.[12]

### D. The Agency's corrective action is based on the GAO's decision.

Perhaps recognizing the infirmities with the GAO's analysis (that the Agency clearly rejected), the Government now argues that the corrective action was not based solely on the GAO decision. Oral Argument at 2:07:48-2:08:28 (arguing that the GAO decision isn't the "end-all-be-all" for the Agency's decision to take corrective action). Instead, the Government contends that its decision to take corrective action includes an independent rationale not based on the GAO decision. Namely, it intends to take corrective action to determine, in the first instance, whether the PWS work is within the LCATs in the offerors' GSA contracts. *See generally* ECF No. 28 at 23. There are several problems with this argument.

As an initial matter, the Government misunderstands the issue before the Court. According to the Government, "[t]o determine whether NGA's corrective action is reasonable, the Court must first determine whether the PWS Statistician requirement *could* be read to require an exact match." ECF No. 28 at 13. But no protestor is complaining about ambiguity in the RFQ. Indeed, Deloitte contends that "[t]he PWS language is unambiguous . . . ." ECF No. 26-1 at 17. In a rare moment of agreement, Kearney argues that "[n]o ambiguity exists . . . ." ECF No. 30 at 3; *see also id*. at 4 (arguing "NGA did not issue an ambiguous RFQ"). It is difficult to see how corrective action to rectify a purported ambiguity is rational when all the protestors reject the very notion that the RFQ is ambiguous.

And there is a bigger problem. This is a *post*-award protest in which a protestor must establish prejudice. Thus, the question before the Court is not whether someone hypothetically

---

[12] Because the Court concludes that the GAO applied the wrong standard, it need not reach the arguments about timeliness and other defects with the analysis.

13

"could" read the RFQ to require the GAO's exact match standard, the question is whether any protestor *did* read the RFQ that way. Here, the parties' arguments and their proposals (as discussed above) make clear nobody other than the GAO attorney read the RFQ to require an exact match between the PWS work and the LCATs. The Government points to nothing to the contrary. The lack of any offeror being misled means that the hypothetical ambiguity is not a rational basis for corrective action post-award. *Superior Optical*, 152 Fed. Cl. at 326.

The Government's new rationale is also unequivocally not the rationale that the Agency provided when it undertook corrective action. Because the Agency's decision to take corrective action is set forth in two documents—the Memorandum for Record filed with the GAO, and RFQ Amendment 4—the Court limits its consideration of the Agency's rationale to what is set forth in those documents. *Sys. Application*, 100 Fed. Cl. at 716. In those documents, the Agency explicitly relied on the GAO predictive outcome as the sole basis for taking corrective action, even though the Agency did not agree with the GAO attorney—"NGA may not fully agree with the concerns expressed by GAO, in the interests of good governance, the Agency has determined it to be in its best interest to take corrective action as detailed below." ECF No. 19-2 at AR 4603; *see also id.* at AR 4597 ("In response to GAO's concerns with the corrective action that were identified in the conference call, the Agency deemed it appropriate to reassess its proposed corrective action."). Again, in its earlier notice of corrective action, ECF No. 19-1 at AR 3433, the Agency explicitly referenced "the ground on which [GAO] intend[s] to sustain" as the basis for its corrective action. *Id.* at AR 3433. The Court cannot accept a post-hoc rationalization, but instead must focus on the reasons the Agency offered contemporaneously with its decision to take corrective action. *Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 397 (1974) ("But as it is, we cannot accept appellate counsel's post hoc rationalizations for agency action; for an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself.") (internal quotations omitted). Because the notice of corrective action exclusively relied on the GAO's reasoning as the basis for the corrective action, the Court finds that the Agency decided to take corrective action based on the GAO decision.

In addition, the Agency argued to the GAO that it *did* evaluate the mapping of each position to ensure that the offeror's offered LCATs covered the work sought in the PWS. According to the Agency, "even though NGA determined that the offerors' proposed FSS contract LCATs met the functional requirements of the RFQ's Senior Statistician position, GAO's interpretation of the RFQ was that the RFQ required an exact match between the FSS LCAT description and the PWS's description for the Senior Statistician." ECF No. 19-2 at AR 4596; *see also* ECF No. 19-1 at AR 3213-16. Before this Court, however, the Government contends that neither the SSEB nor the SDA considered the issue. ECF No. 28 at 19. That said, the Government contends that the corrective action is appropriate because "NGA will *again* evaluate whether the labor category proposed in the revised quotes are sufficiently close to the Statistician requirement using the additional explanation in response to Amendment 4." ECF No. 31 at 13 (emphasis added). Of course, the Agency cannot evaluate something "again" if it did not evaluate it before.

The Court must first note that these two positions are—at best—hard to reconcile. At the GAO, the Agency attorneys argued that the Agency *did* properly map between Kearney's LCATs and the PWS requirements. *See, e.g.*, ECF No. 19-1 at AR 3219-3223 (citing the SSEB Chair report which concluded that "[Kearney's] proposed mix [was] consistent with their

14

proposed approach to meet the PWS technical requirements of Section 2.4."). Additionally, before the GAO, the Agency argued that "to the extent the Agency was too lenient in mapping scope to vendor labor categories, Deloitte suffered no prejudice because the Agency was consistent across quotes." *Id.* at AR 3216. That statement is hard to square with the Government's current position that *no* mapping occurred. ECF No. 28 at 19 ("NGA reasonably and rationally amended the RFQ to require vendors to provide an explanation that will allow NGA . . . to evaluate this mapping issue *in the first instance* and contemporaneously document its conclusions.") (emphasis added).

In the end, the analysis in *Systems Application & Technologies, Inc*. proves most persuasive. There, because the agency relied upon a predictive outcome message from a GAO attorney when deciding to take corrective action, the Court found it appropriate to review the rationality of the GAO attorney's predicted outcome. *Sys. Application*, 100 Fed. Cl. at 713. The same is true here.

> E. Deloitte's arguments that the Statistician-Senior role is beyond the scope of Kearney's FSS contract fail.

Deloitte argues that because Kearney's Senior Management Analyst (the LCAT Kearney mapped to) "has no relevant statistical experience or expertise," ECF No. 29 at 6, Kearney is ineligible for award. The Competition in Contracting Act ("CICA") requires that unless an exception applies, the Agency must award contracts through full and open competition. *See* 41 U.S.C. § 3301(a). When an agency orders goods or services from an FSS contract (also known as a GSA Schedule Contract) under FAR Part 8, the order is "considered to be issued using full and open competition." 48 C.F.R. § 8.404(a). But there is a limiter on the use of FSS contracts—the agency may seek only items that are on the FSS contract. *Id*. ("Therefore, when . . . placing orders under Federal Supply Schedule contracts using the procedures of 8.405, ordering activities shall not seek competition outside of the Federal Supply Schedules or synopsize the requirement . . . ."). According to Deloitte, because Kearney does not have any LCAT that maps to the Statistician-Senior, any award to Kearney would violate CICA and FAR 8.404. *E.g.*, *Eracent, Inc. v. United States*, 79 Fed. Cl. 427, 430 (2007) ("To place an order using the GSA FSS procedures, the contracting agency must verify that all items on the order are within the scope of the vendor's FSS contract.").

Deloitte's argument is based solely on its insistence that Kearney's Senior Management Analyst does not reasonably encompass the duties of the Statistician-Senior. While Deloitte also insists that the GAO attorney stated in the predictive outcome that Kearney could not map the Statistician-Senior to its LCAT, that was, for the reasons stated above, based on an unsupported reading of the RFQ. The Court finds it hard to fathom why Deloitte's Risk Senior Support III sufficiently encompasses the PWS work because Deloitte incanted the words "subject matter expert" in its LCAT, as Deloitte contends, yet Kearney's mapping fails. Indeed, putting such reliance on the phrase "subject matter expert" runs perilously close to relying on a job title rather than substantive duties, which is not sufficient. *Eagle Techs., Inc.*, 163 Fed. Cl. at 703; *HomeSource*, 94 Fed. Cl. at 486.

Before the GAO, the Agency vigorously defended its evaluation of each offeror's LCAT mapping. *See*, *e.g.*, ECF No. 19-1 at AR 3212-17. With regard to the Statistician-Senior

15

mapping, the Agency made clear its view that the PWS requirement to "'design[] statistical samples and using statistical methods to calculate population estimates and from sampling errors from a probability sample' – may reasonably be viewed as encompassed within Kearney's Senior Management Analyst" LCAT.  *Id*. at AR 3214 (quoting the PWS requirement).  This mapping was reasonable, according to the Agency, because the Kearney Senior Management Analyst "provides specific knowledge and methodologies for process improvements or reengineering of systems.  The Senior Management Analyst assists or may lead in the actual performance of systems reviews by identifying appropriate substantive testing, potential risks, and test of controls."  *Id*. (quoting Kearney's FSS contract).  And this was, according to the Agency, sufficiently close to map the requirements and comply with CICA.  Indeed, the Government repeats these arguments here as demonstrating that Deloitte fails to establish that there is no circumstance in which Kearney can reasonably map the Statistician-Senior to its LCAT.  ECF No. 31 at 13-14.  While the Agency's defense of Kearney's mapping may not be contemporaneous, they are in the record before GAO.  And more importantly, Deloitte's protest is not asking this Court to review the Agency's determination that the mapping was reasonable; rather, Deloitte is asking this Court to rule as a matter of contract interpretation that there is no Kearney LCAT that plausibly covers the Statistician-Senior in the PWS.  The Court, however, disagrees with Deloitte.

Deloitte's arguments appear to be placing too large an emphasis on titles and broad terms rather than evaluating the true functional duties of the LCATs.  The Court cannot say as a matter or law (or as a matter of rationality), that the Agency's defense of Kearney's mapping fails or that the Statistician-Senior cannot be mapped to Kearney's Senior Management Analyst LCAT.  Indeed, "substantive testing" can plausibly be understood to cover the statistical analyses the Agency sought.

In the end, the Court does not see any reason why Deloitte's reference to a "subject matter expert" is sufficient to establish a valid mapping but Kearney's mapping fails.  Like the GAO attorney, this Court cannot agree that Kearney's LCAT mapping isn't permissible while Deloitte's is.

### F.     Reinstatement of the terminated contract.

Among the relief that Kearney seeks is an order directing the Agency to reinstate Kearney's contract that was terminated as part of the corrective action.  Here, Kearney relies on the Federal Circuit's decision in *Turner Construction*, which concluded that:

> In this case, the Army had already determined that Turner represented the best value offer and lawfully awarded it the contract.  The Army then acted arbitrarily and capriciously by following the GAO's irrational recommendation to overturn that award and re-procure the contract.  The Court of Federal Claims fashioned a remedy that restored the parties to their positions before the Army's unlawful action.  This remedy included enjoining the re-procurement of the contract and ordering that Turner's contract be reinstated.

*Turner Constr.*, 645 F.3d at 1388.  That certainly indicates that this Court can, at least in some instances, order an agency to reinstate a terminated contract.  Indeed, the FAR does give the Agency the authority to reinstate the contract if it chooses.  48 C.F.R. § 49.102(d), which provides that: "Upon written consent of the contractor, the contracting office may reinstate the terminated portion of a contract in whole or in part by amending the notice of termination if" certain determinations are made.

But there is a limitation on the Circuit's holding in *Turner Construction*.  Notably, the Federal Circuit hedged its holding somewhat by making clear that it was allowing the injunction to order the reinstatement because:

> The Army did not challenge the Court of Federal Claims' ability to order reinstatement as a remedy.  Rather, in implementing the Court of Federal Claims' order, the Army examined the circumstances and *independently* concluded that reinstatement was in fact advantageous to the Army.  *See* 48 C.F.R. § 49.102(d).  *The fact that the Army has not objected to the scope of the trial court's injunction reinstating the contract is significant, as the government is the only party with standing to object to that relief*.

*Turner Constr.*, 645 F.3d at 1388 (emphasis added).  Thus, the Court does not read too much into *Turner Construction*.

But *Turner Construction* was not the last word on the propriety of this Court ordering an agency to reinstate a terminated contract.  This case is very similar to the situation in *Superior Optical* in which this Court ordered the reinstatement of a terminated contract and the Circuit affirmed under Rule 36.  In *Superior Optical*, the Veterans' Administration agreed to take corrective action after a GAO protest was filed but before any decision was made.  *Superior Optical*, 152 Fed. Cl. at 322.  Here, the Agency agreed to take corrective action as a result of the predictive outcome call.  Like this case, Superior Optical was lawfully awarded a contract.  "At that point, the parties' legal rights viz-a-viz one another changed.  Although the government had the right to terminate the award for convenience or if its needs changed, here that was not the case.  The asserted justification for correction was in error."  *Id*. at 325.  That is the case here.

## IV.    Injunctive Relief

When determining whether to issue a permanent injunction, a court considers: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors granting relief; and (4) whether granting injunctive relief is in the public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).  "The protestor bears the burden of establishing the factors by a preponderance of the evidence."  *SAGAM Securite Sen. v. United States*, 154 Fed. Cl. 653, 671 (2021), *aff'd*, No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023).

The Court first considers success on the merits because it is a necessary element of any injunctive relief. *Dell Fed.*, 906 F.3d at 999. As demonstrated above, Kearney has succeeded on the merits.

When considering irreparable harm, the Court focuses on whether Kearney has "'an adequate remedy at law absent an injunction.'" *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 246 (2021) (quoting *Std. Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 744 (2011)) (additional citations omitted). Kearney will be irreparably harmed here in the same way *Superior Optical* found to establish irreparable harm. Specifically, Kearney was the lawful awardee of the contract and, without injunctive relief "will be forced to compete both against the offerors that it already bested and, in essence, itself." *Superior Optical*, 152 Fed. Cl. at 326. The loss of a properly awarded contract constitutes irreparable harm. *See Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 606 (2016) (collecting cases).

"When considering the balance of the harms, the Court considers whether the harm to the Plaintiff outweighs the harm to the Government and third parties." *Blue Tech*, 155 Fed. Cl. at 246 (citations omitted).[13] Here too the balance of hardships favor granting injunctive relief. The Agency will not face hardship because before the GAO, it defended the award to Kearney, and until the irrational GAO decision, the Agency intended to keep Kearney as awardee. Indeed, the Government argues that the hardships weigh against injunctive relief because "the Government should not be required to proceed without first being allowed to clarify its requirements." ECF No. 28 at 30. But again, there is no dispute that nobody was misled by the RFQ's requirements. The Agency was not confused. Guidehouse was not confused. Ernst & Young was not confused. Kearney was not confused. And, most importantly, Deloitte was not confused. The need to clarify a purported ambiguity that nobody believes was ambiguous is not in the public interest. There is no hardship in now continuing with a lawful award. And Deloitte is not harmed by precluding the irrational corrective action because Deloitte's contention that the Agency cannot award a contract to Kearney failed as a matter of law. In other words, Deloitte is not harmed by not granting it another attempt to win an award that was lawfully made to Kearney.

Finally, the public interest weighs in favor of injunctive relief. "As always, the public has an interest in the fair and lawful procurement of goods and services by the government." *Superior Optical*, 152 Fed. Cl. at 326. The Government insists that the public interest weighs in favor of corrective action to ensure "integrity of the procurement process." ECF No. 28 at 25. However, "[a]bsent a reasonable rationale for corrective action, an offeror may not be forced to compete against itself and other offerors again when it has already won the contract." *Superior*

---

[13] The Tucker Act also requires this Court to "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). This due regard is properly considered when balancing the harms. *Blue Tech*, 155 Fed. Cl. at 246 ("'[T]he fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harms factor on the defendant's side of the scale.'" (quoting *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997)). While this procurement is for a member of the intelligence community, the Government does not make any argument that national security or defense interests are implicated here.

18

*Optical*, 152 Fed. Cl. at 326.  In other words, the public interest in the integrity of the procurement process supports injunctive relief when the decision to take corrective action is "based on an irrational GAO recommendation."  *VS2*, 155 Fed. Cl. at 772.

Therefore, the Court concludes that all four factors weigh in favor of granting injunctive relief.

**V.	Conclusion**

Based upon the foregoing, the Court GRANTS Kearney's motion for judgment on the administrative record, ECF No. 27, DENIES Deloitte's motion for judgment on the administrative record, ECF No. 26, and DENIES the Government's cross-motion for judgment on the administrative record, ECF No. 28.  Accordingly, the Court ORDERS:

1. The National Geospatial-Intelligence Agency is hereby enjoined from proceeding with the corrective action contained in Amendment 4 to the RFQ.

2. The Agency must reinstate the award to Kearney to return to the status quo ante and is prohibited from recompeting the contract absent a lawful reason to do so.

3. The Clerk's Office is directed to enter judgment accordingly.

It is so ORDERED.

s/ Edward H. Meyers<br>Edward H. Meyers<br>Judge